1
2
3
4
5          **UNITED STATES DISTRICT COURT**
6          EASTERN DISTRICT OF CALIFORNIA
7
   STEVEN LOUIS RICHARDS,                    1:07-cv-01805-LJO-SMS (HC)
8
                          Petitioner,        FINDINGS AND RECOMMENDATION
9                                            REGARDING PETITION FOR WRIT OF
             v.                              HABEAS CORPUS
10
                                             [Doc. 1]
11  MIKE MCDONALD,
12                       Respondent.
                                        /
13

14          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

15  pursuant to 28 U.S.C. § 2254.

16                                RELEVANT HISTORY

17          Following a jury trial in the Superior Court of the State of California, County of

18  Stanislaus, Petitioner was convicted of first degree burglary (Cal. Pen. Code § 459)[1], attempted

19  burglary (§§ 664/459), burglary (§ 459), passing an altered or forged check (§ 470(d)), and

20  misdemeanor resisting arrest (§ 148).  The trial court found true that Petitioner suffered three

21  prior 1994 burglary convictions (§§ 1192(c), 667(d)), and the following 1983 prior felonies

22  pursuant to sections 667(d) and 1192.7(c): rape (§ 261(a)(2)); sodomy with a person under 14

23  years of age and more than 10 years younger (§ 286(c)); sodomy in concert (§ 286(d)); oral

24  copulation with a person under 14 years of age and more than 10 years younger (§ 288a(c)(1));

25  and oral copulation in concert (§ 288a(d)).

26          On appeal, the California Court of Appeal, Fifth Appellate District reversed and

27  _____

28          [1] All further statutory references are to the California Penal Code unless otherwise indicated.

                                            1

1   remanded the matter to the trial court for a postconviction Marsden hearing.  (Lodged Doc. No.

2   1, at 60.)  The appellate court also directed the trial court to dismiss one of the section 667(a)

3   enhancements and resentence Petitioner to a total term of 85 years to life.  (Id.)  The trial court

4   denied Petitioner's Marsden motion and motion for new trial.  (Lodged Doc. No. 2.)  Petitioner

5   was also resentenced to a total term of 85 years to life.  (Id.)

6          Petitioner filed a timely appeal to the California Court of Appeal, Fifth Appellate District.

7   On October 24, 2008, the Court modified the amount of presentence credits, but otherwise

8   affirmed the judgment.

9          On January 16, 2007, Petitioner filed a petition for review in the California Supreme

10   Court.  (Lodged Doc. No. 6.) The petition was denied on February 21, 2007.  (Lodged Doc. No.

11   7.)

12          Petitioner filed the instant federal petition for writ of habeas corpus on December 7, 2007.

13   (Court Doc. 1.)  On July 14, 2009, the Court determined that the petition contained an

14   unexhausted claim, and granted Petitioner the opportunity to withdraw the claim.  Upon

15   Petitioner's request, the Court granted the request to withdraw the unexhausted claim from the

16   petition.  (Court Docs. 20-22.)

17          Respondent filed an answer to the petition on November 6, 2009.  (Court Doc. 26.)

18   Petitioner did not file a traverse.

19                                STATEMENT OF FACTS

20          Appellant was charged and convicted of multiple felonies based on the
    following incidents.

21

22   Counts I, III & IV

23          Diane Castillo lived next to Robert and Anna Williams, on East Fairmont
    in Modesto. Around 9:00 a.m. on Saturday, July 10, 2004, Ms. Castillo was taking
    things from her car into her house, when she saw a man walk out of the Williams'
24   backyard. The man walked out of the Williams' side gate, turned around, looked at
    Ms. Castillo, and then went back through the gate and returned to the Williams'
25   backyard. He was carrying a partially-filled black garbage bag. Castillo decided to
    call the police because she knew Mr. and Mrs. Williams were out of town and she
26   did not recognize the man.

27          Modesto Police Officer Curtis Musto responded and spoke to Ms. Castillo,
    who stated she was about 80 feet away from the suspect and described him as a
28   Hispanic in his 20's, about five foot seven inches tall, 190 pounds, and wearing

                                        2

baggie jeans, a Pendleton shirt, and a baseball cap. Officer Musto went to the Williams' house. No one was there, but the gate was ajar and the back door was kicked in. The door led to the garage, and the garage was attached to the house. Officer Musto walked through the house and determined it had not been ransacked and nothing appeared to be disturbed.

Sometime between 1:00 p.m. and 2:00 p.m. that day, appellant walked into the Money Mart check-cashing office in Modesto. Appellant presented the clerk, Mri Carmen Hernandez, with check No.2056 from the account of "Robert S. Williams" and "Anna V. Williams." The check was written out to appellant, and signed by Mr. Williams. Appellant also presented a valid California photographic identification (ID).[2]

Ms. Hernandez testified appellant presented the check to her. It was already filled out and he did not write anything on the check in her presence. She did not know if he had signed the back of it. Ms. Hernandez asked appellant what the check was for. Appellant said he had done "a side job for the maker, like you work for, like, somebody on the job, under the table," and that he did it for the people named on the check. He did not specifically say the names of the people he worked for.

Ms. Hernandez determined appellant had probably cashed checks there before because his name was in Money Mart's computer system. Ms. Hernandez testified she did not have any formal handwriting expertise, she did not have any training in handwriting analysis as part of her job, and she was not familiar with appellant's handwriting. Nevertheless, Ms. Hernandez testified the check did not look right to her, because the handwriting on the check seemed similar to appellant's signature on the photo ID. She thought the words "side job" were written in the check's memo line, which she also thought was unusual.

Ms. Hernandez made a copy of the check and appellant's photo ID, and then followed the company's policy and called the telephone number on the check to confirm the maker had written the check to the named party. Ms. Hernandez reached a telephone answering machine, and left a message that she was trying to confirm the check. She then returned to the counter and advised appellant that she could not cash the check because she could not confirm it with the maker. Appellant became very angry and yelled at Ms. Hernandez, and asked why they did not cash the check because he had his ID. He took the check and his identification and "stormed" out.

A few minutes later, appellant returned to the Money Mart and again asked to cash the check. Ms. Hernandez again called the telephone number on the check, reached a telephone answering machine, left a message, and advised appellant that she could not cash the check because she could not confirm it with the maker. Appellant again became angry, grabbed the check and his identification, and left.

On Sunday, July 11, 2004, Anna Williams and her children returned to their house and they were immediately intercepted by Ms. Castillo, who told them that someone broke into the house. Mrs. Williams and another neighbor walked through the house. Mrs. Williams discovered the toilet was running, the shower curtain had been moved, and a package of her husband's socks had been moved

---

[2] The amended information alleged the amount of the check was $200.

from a drawer onto their bed; nothing else was disturbed. Mr. Williams arrived home later and called the police. The police again walked through the house with Mr. and Mrs. Williams, and they thought that nothing had been taken or damaged, aside from the backdoor.

After the police left, Mr. Williams played the messages on their telephone answering machine, and heard the message from the Money Mart to verify a check written to "Steven Richards." Mr. and Mrs. Williams went through their house again and discovered their checkbook was missing. They also discovered the jewelry had been removed from Mrs. Williams' jewelry box, and a new package of men's T-shirts had been taken from the bedroom.

On Monday, July 12, 2004, Mr. and Mrs. Williams went to the bank and closed their account. Next, they went to the Money Mart, and received a copy of the check and photographic ID which appellant presented. Mr. Williams examined the copy of the check, and testified that he did not write or sign the check. Mrs. Williams thought the writer had misspelled "Williams." Mr. and Mrs. Williams did not know appellant and had not hired him to work for them.

Mrs. Williams believed she showed Ms. Castillo the copy of the check and photo ID which they obtained from Money Mart, but could not remember exactly when that conversation occurred. Mr. Williams testified that after they returned from Money Mart, he spoke with Ms. Castillo and showed her the copy of the check and the photo ID. Mr. Williams testified that Ms. Castillo looked at the photo ID "and said that that was definitely him."

Mr. and Mrs. Williams gave the photocopy of the check and appellant's photo ID to the police. The police department issued an "information and belief" warrant for appellant, that he was wanted for burglary and forgery. Mrs. Williams's jewelry was not recovered.

At trial, Ms. Castillo identified appellant as the person who walked out of the Williams' backyard with the plastic bag. Ms. Castillo testified she was about 25 to 30 feet away from appellant, she made eye-contact with him, she had a clear view of him, and she got a good look at him. Ms. Castillo testified that about a week after the incident, an officer showed her a photographic lineup and she identified appellant.

Ms. Castillo testified that Mr. and Mrs. Williams showed her the copy of the check and photo ID they obtained from the Money Mart, but she could not remember if that occurred before or after she looked at the officer's photographic lineup.

"Q. Do you remember if you saw that check and identification before you pointed to the photographs [in the lineup]?

"A. I really honestly can't remember, but I do remember when I saw this, it didn't look anything like the picture I had picked out in that here, he didn't-he doesn't look like the same person, to me, it looks darker and is just different."

Ms. Williams recalled that she saw the copy of the forged check and photo ID, which were on one piece of paper.

"Q. So when you saw the check, you were able to see the identification at the same time, right?

4

"A. It's not something that I concentrated on. I didn't really concentrate on it, to be quite honest with you."

Ms. Castillo testified her trial identification of appellant was based on her observations of him when he walked out of the Williams' backyard, and not because she saw the copy of his photo ID. "It's because I saw him. It's not the ID. I have not paid any attention to that at all."

Based on this incident, appellant was charged and convicted with count I, first degree burglary of the Williams' residence, count III, second degree burglary, based on appellant's entry of the Money Mart store to cash a forged check, and count IV, passing an altered or forged check.

*Counts II & V*

Around 11:00 p.m. on July 22, 2004, Mr. and Mrs. Clarendon Hetrick were in bed at their home in Modesto when they heard someone knock at their front door, open the unlocked screen door, and try to open the front door latch. Mrs. Hetrick did not open the door but looked through a window. There were no lights on inside the house, but the area outside the front door was well-illuminated. Mrs. Hetrick saw a man walk away from the door, pushing a bicycle toward her neighbor's house. Mrs. Hetrick believed the man left, so she went back to bed.

About four or five minutes later, Mrs. Hetrick again heard someone try to open the front door handle. Mr. Hetrick then thought he heard someone in the backyard. Shortly afterwards, they heard someone try to open the backdoor handle, followed by a squeaking sound as if someone was trying to open a screen. They next heard someone repeatedly bang on their metal back door, as if trying to kick it down.

Mrs. Hetrick immediately called the police. The loud banging continued as she was on the telephone with the emergency operator, who commented that she could also hear the loud banging. Mr. Hetrick grabbed his revolver, cocked the trigger, and waited next to the backdoor as the loud banging continued. The backyard was highly illuminated but Mr. Hetrick could not see who was standing at the door.

Officers Rigo Dealba and Matthew Spurlock arrived at the Hetricks' house within minutes of Mrs. Hetrick's telephone call. The officers were in uniform. As they approached the residence, they could hear loud banging coming from the backyard.

The officers cleared the front yard of any suspects, looked over the fence, and saw appellant standing by the back door. Officer Dealba pulled his service revolver, opened the fence gate, identified himself, and ordered appellant to get on the ground. Appellant replied that he did not do anything. Officer Dealba realized appellant was holding a rock in his right hand, and appellant "cocked the rock back as if he was gonna throw it." Officer Spurlock also drew his gun and testified appellant spun and raised the rock as if he was going to throw it. Officer Dealba repeatedly ordered appellant to drop the rock and get on the ground. Appellant lowered his arm but held onto the rock. Officer Dealba told him to drop the rock several more times, and appellant finally dropped the rock.

Both officers repeatedly ordered appellant to the ground. Officer Dealba returned his weapon to his holster but Officer Spurlock continued to hold his weapon on appellant. Appellant ignored their commands to get on the ground, and instead raised up his clenched fists in a fighting stance, and started to walk toward the officers. Spurlock thought appellant was going to come at him.

Officer Dealba approached appellant and tried to take him into custody. Officer Spurlock testified appellant "started to tussel" and his arms were "going in a punching manner, just resisting altogether." Officer Dealba punched appellant in the face, and Officer Spurlock used his baton and hit appellant's lower leg twice. The officers used their body weights to bring down appellant, and handcuffed his arms behind his back.

Appellant had identification in his possession, which stated that he was 38 years old. Appellant was about five foot six inches tall and 200 pounds. Appellant had a backpack which contained food, clothes, and three watches.[3] The officers found a bicycle by the house.

The police asked Mr. and Mrs. Hetrick to look at appellant, and Mrs. Hetrick recognized him as the man who was at the front door. Mrs. Hetrick testified appellant was yelling, " 'I didn't do anything.' " The Hetricks did not know appellant. There were large scratches on the backdoor. The Hetricks determined appellant had used a large grinding stone from their backyard rock collection to pound on the backdoor.

The officers took appellant into custody and placed him in the patrol car. Officer Spurlock noticed a man on a bicycle, riding across the street from the Hetricks' house. The man rode up to another patrol car and looked inside. Spurlock asked what he wanted. The man, later identified as either Robert or Michael Wren, said he saw the police cars and just wanted to check it out. The man had on bulky clothes and acted weird. Spurlock asked if he could conduct a pat-down search for weapons, and the man agreed. Spurlock found a revolver in the man's pocket. The officers did not discover any information to connect appellant and Wren.

The officers took appellant to the hospital for medical clearance because of their use of force. Officer Dealba testified appellant made some statements without being questioned. Appellant said "that we had nothing on him because-or the only thing we had on him was trespassing because there wasn't any damage to the door and that he was just looking for a place to pee."

"Q. Did he also mention something about trying to get away from a guy named Mike who had a gun?

"[OFFICER DEALBA]: No.

"Q. Do you remember him saying anything about that at all?

"A. No."

---

[3] Mr. and Mrs. Williams later looked at these watches but the items had not been taken from their house.

1

2          Officer Dealba advised appellant that he was under arrest for the incident
   at the Hetricks' house, and that there was an "information and belief" warrant on

3  him for burglary at a residence on East Fairmont and forgery at the Money Mart.
   Dealba did not know anything about the other incident, and simply read the

4  "information and belief" warrant to appellant. Appellant said "he had a check that
   he tried to cash at the Money Mart the friend gave him, but they wouldn't cash it,

5  he left with the check, but didn't have it anymore ." Appellant never identified his
   friend.

6          Based on this incident, appellant was charged and convicted of count II,
7  attempted burglary, and count V, misdemeanor resisting arrest.

8          The court found he suffered eight prior strike convictions and two prior
   serious felony enhancements, and he was sentenced to the third strike term of 95

9  years to life. On appeal, he raises several issues of alleged instructional error.[4]
   Appellant also contends the court improperly denied his motion to dismiss his

10 prior strike convictions, his indeterminate term constitutes cruel and/or unusual
   punishment, and his prior juvenile adjudications could not be used to impose the

11 prior serious felony enhancements. Finally, he asserts the court improperly denied
   his postconviction motion for new trial.

12 (Lodged Doc. No. 1, Opinion, at 2-10) (footnotes in original.)

13                                    DISCUSSION

14 A.    Jurisdiction

15        Relief by way of a petition for writ of habeas corpus extends to a person in custody

16 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

17 or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

18 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

19 violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

20 out of the Stanislaus County Superior Court, which is located within the jurisdiction of this

21 Court.  28 U.S.C. § 2254(a); 2241(d).

22

23

   ──────────────────

24        [4] Appellant concedes he did not object to any of the instructions which he now challenges
   on appeal. An appellate court may review any instruction given, even though there was no

25 objection made in the trial court, if substantial rights of the defendant are affected, "i.e., resulted
   in a miscarriage of justice, making it reasonably probable the defendant would have obtained a

26 more favorable result in the absence of error." (People v. Andersen (1994) 26 Cal.App.4th 1241,
   1249; § 1259.) As we will explain post, appellant contends the purported instructional errors

27 affected his substantial rights, and we will thus review appellant's appellate contentions.

28

                                        7

1      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

2  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

3  enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

4  F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

5  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

6  1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

7  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

8  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

9  B.    Standard of Review

10      Where a petitioner files his federal habeas petition after the effective date of the Anti-

11  Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

12  the state court's adjudication of his claim:

13      (1) resulted in a decision that was contrary to, or involved an unreasonable
        application of, clearly established Federal law, as determined by the Supreme
14      Court of the United States; or

15      (2) resulted in a decision that was based on an unreasonable determination of the
        facts in light of the evidence presented in the State court proceeding.
16

17  28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

18  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

19  materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown

20  v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06

21  (2000).  A state court decision will involve an "unreasonable application of" federal law only if it

22  is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti,

23  537 U.S. 19, 24-25 (2002) (*per curiam*).  "A federal habeas court may not issue the writ simply

24  because that court concludes in its independent judgment that the relevant state-court decision

25  applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

26  omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

27      "Factual determinations by state courts are presumed correct absent clear and convincing

28  evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

1   and based on a factual determination will not be overturned on factual grounds unless objectively

2   unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

3   Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

4   apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v.

5   Blodgett, 393 F.3d 943, 976-77 (2004).

6   Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501

7   U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but

8   provided no reasoned decision, courts conduct "an independent review of the record . . . to

9   determine whether the state court [was objectively unreasonable] in its application of controlling

10  federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we

11  independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v.

12  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

13  C.   Instructional Error-CALJIC No. 2.71

14  Petitioner claims that CALJIC No. 2.81 violated his due process rights because it singled

15  out his statements and permitted the jury to construe them as admissions raising inferences of

16  guilt favorable to the prosecution.

17  A challenge to a jury instruction solely as an error under state law does not state a claim

18  cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

19  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

20  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

21  process.  See, id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

22  must be considered in the context of the instructions as a whole and the trial record.  Id.  The

23  court must evaluate jury instructions in the context of the overall charge to the jury as a

24  component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169 (1982)

25  (citing Henderson v. Kibbe,  431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined

26  that the instruction violated the petitioner's right to due process, a petitioner can only obtain

27  relief if the unconstitutional instruction had a substantial influence on the conviction and thereby

28  resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710

9

1    (1993) (whether the error had a substantial and injurious effect or influence in determining the

2    jury's verdict.).  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

3    demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

4    attack on the constitutional validity of a state court's judgment is even greater than the showing

5    required to establish plain error on direct appeal."  Id.  With this standard in mind, the Court will

6    review each of Petitioner's challenges to the jury instructions.

7           The last reasoned decision of the Court of Appeal, found the claim without merit because

8    it was not reasonably probable that Petitioner would have received a more favorable result even

9    if the court had not instructed the jury with CALJIC No. 2.71.

10          The jury was instructed with CALJIC No. 2.71, which states:

11                 An admission is a statement made by a defendant, which does not by itself
             acknowledge guilt of a crime(s) for which the defendant is on trial, but which
12           statement tends to prove guilt when considered with the rest of the evidence.

13                 You are the exclusive judges as to whether the defendant made an
             admission, and if so, whether that statement is true in whole or in part.
14
                    Evidence of an oral admission of the defendant not made in court should
15           be viewed with caution.

16
     (CT 98; RT 198-199.)
17
            In denying the claim, the appellate court held, in pertinent part, the following:
18
                    In the instant case, the entirety of the record supports the trial court's
19           decision to give CALJIC No. 2.71, even though appellant's pretrial statements
             were not direct or express admissions of guilt. At the instructional conference,
20           appellant did not object to CALJIC No. 2.71, but disagreed with the prosecutor's
             assertion that his statements were admissions "with regard to intent to burglarize"
21           the Hetricks' house. However, appellant's statements were ambiguous or even
             neutral under the circumstances of this case. Ms. Hernandez testified appellant
22           appeared at the Money Mart with a check from Mr. and Mrs. Williams' bank
             account, and claimed he received the check for doing a "side job" for the maker of
23           the check. Mr. Williams testified their checkbook had been stolen, he did not
             write the check which appellant presented to the Money Mart, he did not know
24           appellant, and he did not hire appellant to do any work for him. While appellant
             did not specifically identify Mr. or Mrs. Williams as his employers, the jury could
25           have inferred from Ms. Hernandez's testimony that appellant presented the check
             because he did some work for the people who wrote the check.
26
                    As for the incident at the Hetricks' house, appellant knocked on the front
27           door, received no response, tried to open the front door, and then used a large rock
             to try and knock down the back door. Officer Dealba testified appellant made
28           statements after his arrest, without being questioned, that "we had nothing on him

                                                   10

because-or the only thing we had on him was trespassing because there wasn't any damage to the door and that he was just looking for a place to pee." When Officer Dealba advised him that he was being arrested for the "information and belief" warrant for the East Fairmont burglary and the Money Mart forgery, appellant said "he had a check that he tried to cash at the Money Mart the friend gave him, but they wouldn't cash it, he left with the check, but didn't have it anymore."

The circumstances of appellant's statements raised factual questions as to whether they could be construed as admissions, i.e., that they tended to prove his guilt when considered with the rest of the evidence.[5] Appellant's statements could have been interpreted as his attempts to distance himself from the offenses, which would have constituted evidence of consciousness of guilt. Appellant told Ms. Hernandez he received the check for doing a side job for the people who wrote the check; when he was advised that he was being arrested for burglary and forgery, he claimed he received the stolen and forged check from someone else. Appellant tried to open the front door at Mr. and Mrs. Hetricks' house and used a large stone to repeatedly pound against the back door, conduct consistent with trying to break into the house, but claimed the officers had nothing on him except for trespassing and he was only trying to find a place to relieve himself.

Even if the trial court erred by giving CALJIC No. 2.71, any error was harmless. CALJIC No. 2.71 told the jury that any out of court statement made by appellant should be *viewed with caution,* that the jury was the exclusive judge of whether appellant made the admission and, if so, whether it was true, such that the inference of guilt suggested by CALJIC No. 2.71 was a permissive one. (See, e.g., *People v. Rankin* (1992) 9 Cal.App.4th 430, 436 (*Rankin* ).)

"[CALJIC No. 2.71] ... defined an admission as an out-of-court statement by defendant 'which tends to prove guilt.' 'In light of the definition of "admission," if the jury determines a statement does not tend to prove guilt when considered with the other evidence, it is not an admission. The cautionary language instructs the jury to view evidence of an *admission* with caution. By its terms, the language applies only to statements which tend to prove guilt and not to statements which do not.' [Citation.] 'Juries understand that this instruction by its terms applies only to statements tending to prove guilt, not to exculpatory ones. To the extent a statement is exculpatory it is not an admission to be viewed with caution. [Citation.]' [Citation .]" (*Slaughter, supra,* 27 Cal.4th at p. 1200, italics in original.)

Thus, a defendant could not be prejudiced "by the erroneous giving of the instruction to view his admissions with caution." (*Slaughter, supra,* 27 Cal.4th at p. 1200.) The jury was also given CALJIC No. 17.31, that it should disregard any instructions that were inapplicable to the facts, and we presume the jury followed the court's directive. (*People v. Waidla* (2000) 22 Cal .4th 690, 725 (*Waidla* ).)

Appellant asserts that if CALJIC No. 2.71 was improperly given, the error is prejudicial because the evidence against him was weak. Appellant asserts Ms. Castillo's trial identification was not strong because her initial description of the suspect, as an Hispanic in his 20's, did not match appellant's appearance as a non-

---

[5] Respondent makes the curious observation that appellant's statements were not admissions. The entirety of the record, however, clearly raised the factual question for the jury to resolve as to whether appellant's statements were admissions when considered with the rest of the evidence at trial.

Hispanic who was 38 years old; she described the suspect as wearing baggie jeans, a Pendleton shirt, and a cap, and "there was no evidence he had ever worn baggy denim jeans, a Pendleton, or a cap." Appellant asserts that CALJIC No. 2.71 allowed the jury to overlook these discrepancies. Appellant also argues the instruction permitted the jury to overlook Ms. Hernandez's "tendency to jump to conclusions," particularly her testimony that appellant said he had done a side job for the person on the check. Appellant suggests the jury should have been able to consider his postarrest statement that he received the check from a friend, but CALJIC No. 2.71 again permitted the jury to overlook the possibility that Ms. Hernandez misunderstood what appellant said to her as he tried to cash the check. Appellant further suggests that since he was already in Money Mart's computer system and previously used the company's services, he would have known that the firm called the maker of the check, such that he would not have knowingly present a forged and stolen check for cashing. Appellant asserts that "[o]ther, more solid evidence" supports the inference that he never said he worked for the Williams, posits that "[i]f appellant had stolen the check that morning, he would not have returned and ask that it be run again after if was refused the first time," and he would have forged the check for an amount greater than $200.

Appellant also asserts that CALJIC No. 2.71 prevented the jury from considering the possible connection between appellant and Michael or Robert Wren, who was found in front of the Hetricks' house and armed with a revolver. Appellant argues:

"... Although Officer Dealba purported not to remember appellant's saying anything to him about trying to get away from a man with a gun, Officer Spurlock, indeed, arrested a man with a gun only 17 minutes after appellant was found banging on the Hetrick door. Thus, there was evidence to corroborate appellant's defense that his intent was [to] trespass, not burglary. Although the officer reported appellant's only statement as claiming he was looking for a place to go to the bathroom, the arrest of Mike Wren at the scene shortly after appellant strongly supports an inference that appellant's intention at the Hetrick house was not burglary." Appellant thus asserts CALJIC No. 2.71 allowed the jury to simply infer he was guilty based on his other statements, and prevented it from considering this defense theory.

A court's erroneous decision to give a "consciousness of guilt" instruction is subject to review under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Rankin, supra,* 9 Cal.App.4th at p. 436.) Contrary to appellant's version of the record, the evidence of appellant's guilt was so significant that any error in giving CALJIC No. 2.71 was harmless under any standard. Ms. Castillo positively identified appellant as the person walking out of Mr. and Mrs. Williams' house; thereafter, it was discovered that the Williams' backdoor had been kicked in and their check book was missing. Ms. Castillo insisted that her trial identification of appellant was based on her observations of him at the scene, and not influenced by viewing Money Mart's copy of his photo ID. Appellant insists that Ms. Castillo's description of the suspect to the police was wildly inconsistent with his actual appearance; this issue was developed at trial and raised a factual issue for the jury to resolve, based on their observations of appellant compared to Ms. Castillo's description.

Moreover, just a few hours after being seen at their house, appellant appeared at the Money Mart with a stolen and forged check written on their checking account, and claimed he did a job for the people who gave him the check. Ms. Hernandez clarified that appellant never said that he worked for Mr.

1  and Mrs.

2

3  Williams, but that he did some work for the people who wrote the check. The
   record refutes appellant's characterization of Ms. Hernandez's testimony as
4  "tendency to jump to conclusions."

5       Appellant insists that his conduct at Money Mart was inconsistent with
   knowingly trying to cash a forged and stolen check. But the record suggests just
6  such an inference. Ms. Castillo observed appellant at the Williams' home around
   9:00 a.m. Mrs. Williams later determined the intruder had used the shower and
7  toilet at the house. Appellant appeared at Money Mart just a few hours after he
   left the Williams' house. Based on his morning activities, appellant may have
8  believed no one would answer the Williams' telephone when Money Mart called
   to confirm the check, and that all he had to do was present his valid identification
9  to cash the check and get the money. Such a possibility may explain his frustration
   and anger when Money Mart refused to cash the check. His conduct at Money
10 Mart was not inconsistent with his activities that day.

11      As for the rest of the charges, Mrs. Hetrick heard someone ring their
   doorbell, open the screen, and try to open the front door latch, and clearly
12 observed appellant walking away from their front door. Shortly thereafter,
   appellant was apprehended as he used a large rock and tried to smash open the
13 Hetricks' metal back door.

14      As for appellant's assertion that his statements were consistent with being
   chased by Wren, the alleged gun-wielding man on the bicycle, there is absolutely
15 no evidence that appellant ever said that he was trying to seek refuge from an
   armed assailant. Instead, he told the officers that "he was just looking for a place
16 to pee."[6] It is undisputed that appellant tried to open the front door of the Hetrick's
   house, and used a large stone and tried to break down the back door. His
17 statement that "he was just looking for a place to pee" could also have been
   interpreted to mean he was actually trying to gain entry to the house to use the
18 Hetricks' bathroom, just as he apparently used the Williams' bathroom when he
   kicked down their door.

19
        We thus conclude it is not reasonably probable that appellant would have
20 received a more favorable verdict even if the trial court had not instructed the jury
   to view his statements with caution.

21

22 (Lodged Doc. No. 1, Opinion at 14-19.)

23      There was testimony by store-clerk Mri Hernandez that when Petitioner presented the

24 check for cashing, he said that he had done a "side job" for the Williams. (RT 75-76.)  In

25 addition, when Officers Spurlock and Dealba found Petitioner in the Hetrick's backyard, he told

26

27      [6] According to the probation report, appellant was interviewed by the probation officer
   after the trial and stated that he went into the Hetricks' backyard because he was hiding "from a
28 man with a gun ."

                                         13

them the "only thing the police had on him was trespassing because he had not damaged the [Hetrick's] door and that he was just looking for a place to pee." (RT 114.)  Viewing the instructions as a whole, it is clear that the trial court did not err by instructing the jury with CALJIC No. 2.71.  Indeed, Petitioner did not object to CALJIC No. 2.71, but merely disagreed that his statements were admissions. (RT 154.)  The determination of whether Petitioner's statements were admissions was properly presented to the jury as it raised a factual question.  There was no dispute that Petitioner made pre-trial statements and CALJIC No. 2.71 properly informed the jury that if it determined Petitioner's statements were admissions, such statements were to be viewed *with caution*.  Accordingly, Petitioner's claim is without merit and should be denied.

D.    Instructional Error-CALJIC No. 2.03

Petitioner contends that the trial court erred by instructing the jury with CALJIC No. 2.03-consciousness of guilt because he claims it singles out the testimony of a single witness and invites the jury to draw the most negative possible inference from the statement.

The jury was instructed with CALJIC No. 2.03 which states:

If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt.  However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.

(CT 125.)

In denying Petitioner's claim, the Court of Appeal held the following:

"It is well established that pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant. [Citation.]" (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1102 (*Edwards*).) "As Witkin explains: 'False statements deliberately made by defendants to arresting officers concerning matters within [defendants'] own knowledge, and relating to the issue of guilt or innocence, "cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances."' [Citations.]" (*People v. Kimble* (1988) 44 Cal.3d 480, 496.)

"... The giving of CALJIC No. 2.03 is justified when there exists evidence that the defendant prefabricated a story to explain his conduct. The falsity of a defendant's pretrial statement may be shown by other evidence even when the pretrial statement is not inconsistent with defendant's testimony at trial. The trial court is

required to instruct the jury on applicable principles of law. When testimony is properly admitted from which an inference of a consciousness of guilt may be drawn, the court has a duty to instruct on the proper method to analyze the testimony. CALJIC No. 2.03 is a correct statement of the law; that it may single out defendant is not a determinative factor. [¶] If the jury here believed the testimony of other witnesses, it could reasonably have found defendant's pretrial statements were willfully false and deliberately misleading. From this, the jury could have inferred a consciousness of guilt. The trial court properly instructed the jury in CALJIC No. 2.03." (*Edwards, supra,* 8 Cal.App.4th at pp. 1103-1104.)

Thus, an instruction on consciousness of guilt under CALJIC No. 2.03 is properly given when the evidence supports the inference that the defendant prior to trial made a willfully false or deliberately misleading statement concerning the charged offense. (*Kelly, supra,* 1 Cal.4th 495, 531; *Edwards, supra,* 8 Cal.App.4th at p. 1103; *People v. Williams* (1995) 33 Cal.App.4th 467, 478.) The instruction is applicable "based on defendant's inconsistent and contradicted statements to police attempting to minimize involvement" in an offense. (*People v. Stitely* (2005) 35 Cal.4th 514, 555 (*Stitely*).) A defendant's inconsistent statements to police, initially denying and then admitting commission of the crimes, provide the requisite evidentiary support for the instruction. (*Kelly, supra,* 1 Cal.4th at p. 531.) CALJIC No. 2.03 applies "whether or not the defendant himself contradicts his earlier statement," and is properly given where the defendant's pretrial statement is shown to be false "by the testimony of prosecution witnesses." (*People v. Snow* (2003) 30 Cal.4th 43, 96 (*Snow* ).)

"The inference of guilt suggested by [CALJIC No. 2.03] is a permissive one. The jury is admonished that 'such conduct is not sufficient by itself to prove guilt, *and its weight and significance, if any, are matters for your determination.*' " (*Rankin, supra,* 9 Cal.App.4th at p. 436, italics in original.) "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. [Citations.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.) CALJIC No. 2.03 does not violate due process as long as the evidence provides a rational basis to infer a consciousness of guilt. (*People v. Griffin* (1988) 46 Cal.3d 1011, 1027.) "[I]t *can* be inferred rationally that false statements regarding a crime show a consciousness of guilt of [the charged offenses]." (*Ibid.,* italics in original.)

In *People v. Crandell* (1988) 46 Cal.3d 833 (*Crandell*) (overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365), the defendant faced multiple felony charges, and argued that CALJIC No. 2.03 should have been limited to the murder charge because there was no evidence that he made false statements relating to the kidnapping and assault charges. *Crandell* rejected this argument, and held CALJIC No. 2.03 did not "assume the existence of evidence relating to each charge," but merely instructs the jury "on the use of such evidence should it be found to exist." (*Crandell, supra,* at p. 870.)

*Crandell* also addressed the defendant's arguments that CALJIC No. 2.03, and CALJIC No. 2.06 (attempt to suppress evidence raising inference of consciousness of guilt), permitted the jury to view the "consciousness of guilt" inference "as equivalent to a confession, establishing all elements of the charged murder offenses, including premeditation and deliberation, though defendant might be conscious only of having committed some form of unlawful homicide." (*Crandell, supra,* 46 Cal.3d at p. 871.) The defendant asserted the instructions

15

permitted the jury to draw impermissible inferences, "without foundation in reason or experience, concerning his mental state at the time of the homicides" in violation of due process. (*Ibid.*) *Crandell* rejected these arguments:

> "Defendant's fear that the jury might have confused the psychological and legal meanings of 'guilt' is unwarranted. A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*Crandell, supra,* 46 Cal.3d at p. 871.)

"... CALJIC No. 2.03 does not require the jury to draw an inference of wrongdoing or permit the unrestrained use of an un*Mirandized* statement. On the contrary, before drawing any inference, the jury must first find that the defendant's statement was willfully false or deliberately misleading. Furthermore, the instruction does not ascribe any particular importance to the evidence but permits the jury to decide[ ] what weight or significance, if any, should be given the false statement. In addition, the instruction expressly forbids the jury from basing a conviction *solely* on the fact that the defendant made a false statement." (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1168.)

The California Supreme Court has continued to uphold CALJIC No. 2 .03 against the identical challenges raised by appellant, that CALJIC No. 2.03 is a cautionary instruction that " 'benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.]'" (*People v. Boyette* (2002) 29 Cal.4th 381, 438.) CALJIC No. 2.03 does not improperly endorse the prosecution's theory or lessen its burden of proof, and is not an improper pinpoint instruction. (*Ibid.; Jackson, supra,* 13 Cal.4th at p. 1224; *Kelly, supra,* 1 Cal.4th at p. 531.) As explained *ante, Jackson* addressed CALJIC No. 2.03 and other "consciousness of guilt" instructions, and held they were not improper pinpoint instructions: "[E]ach of [these] instructions made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.] We therefore conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its burden of proof." (*Jackson, supra,* 13 Cal.4th at p. 1224.) "The instructional language sufficiently protects against conviction based on the defendant's false statements or consciousness of guilt alone. [Citation.] Nor is it argumentative or biased in the prosecution's favor. [Citation.] Finally, insofar as the jury believed defendant lied about the charged crimes, the instruction did not generate an irrational inference of consciousness of guilt. [Citation.]" (*Stitely, supra,* 35 Cal.4th at p. 555; see also *People v. Cain* (1995) 10 Cal.4th 1, 34

[instruction does not permit jury to infer whether the defendant possessed the requisite intent]; *People v. Medina* (1995) 11 Cal.4th 694, 762 [CALJIC No. 2.03 is not an argumentative pinpoint instruction].)

As in his attacks upon CALJIC No. 2.71, appellant relies on *Wright,* argues the California Supreme Court has disapproved instructions which pinpoint the testimony of a single witness, and asserts the cases which have upheld CALJIC No. 2.03 must be reconsidered. (*Wright, supra,* 45 Cal.3d at pp. 1135-1136 & fn. 6.) We have already explained, however, that *Kelly* rejected the argument that a "consciousness of guilt" instruction must be reassessed in light of *Wright,* and held such an instruction is valid because it only permits consideration of evidence regarding consciousness of guilt, but cautions such evidence is not sufficient, on its own, to prove guilt. (*Kelly, supra,* 1 Cal.4th at pp. 531-532.)

Appellant acknowledges the long line of California Supreme Court cases which have upheld the language of CALJIC No. 2.03 against various due process challenges. He asserts, however, that all these cases are based on *Crandell,* and *Crandell* should be rejected because it relied on faulty and flawed logic. Appellant cites to *Crandell's* analysis that "[a] reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.'" (*Crandell, supra,* 46 Cal.3d. at p. 871.) Appellant asserts *Crandell's* interpretation of these phrases is refuted by "plain English definitions" of the words "wrongdoing" and "consciousness."

However, in *People v. San Nicolas* (2004) 34 Cal.4th 614, the California Supreme Court rejected similar arguments and again affirmed the validity of CALJIC No. 2.03 and the analysis in *Crandell.* (*People v. San Nicholas, supra,* at pp. 666-667; see also *People v. Bolin* (1998) 18 Cal.4th 297, 327 (*Bolin*).) As with appellant's attacks upon CALJIC No. 2.71, we decline his invitation to disregard California Supreme Court precedent on the interpretation of CALJIC No. 2.03. (*Auto Equity, supra,* 57 Cal.2d at p. 455.)

In the instant case, there was evidence that appellant presented the stolen and forged check at the Money Mart, and told Ms. Hernandez, the clerk, that he received the check from the maker for doing a side job. Ms. Castillo had seen appellant walk out of the Williams' burglarized house on East Fairmont, just a few hours before he appeared at the Money Mart. Mr. and Mrs. Williams testified the check had been stolen from their burglarized house, they did not know appellant and did not hire him to do any work, and Mr. Williams testified his signature was not on the check. When he was apprehended and advised about the outstanding warrant for the East Fairmont burglary and the Money Mart forgery, appellant said a friend gave him the check that he tried to cash at Money Mart. If the jury believed the testimony of Ms. Castillo and Ms. Hernandez, it could have reasonably found that appellant's postarrest statement was willfully false and deliberately misleading, and further inferred a consciousness of guilt. Accordingly, the court properly instructed the jury with CALJIC No. 2.03. (See, e.g., *Snow, supra,* 30 Cal.4th at pp. 96-97; *Arias, supra,* 13 Cal.4th at p. 141.)

Even if the evidence did not support the court's decision to give CALJIC No. 2.03, any error was harmless under either *Watson* or *Chapman.* (*Rankin, supra,* 9 Cal.App.4th at p. 436; see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130 (*Guiton* ); *People v. Robinson* (1999) 72 Cal.App.4th 421, 428-429

1    (*Robinson* ).) CALJIC No. 2.03 presented the jury with a permissive inference, if
     it found the defendant made willfully false or deliberately misleading statement,
2    and further cautioned the jury that such conduct was insufficient by itself to prove
     guilt, and that the jury had to decide the weight and significance, if any, of such
3    evidence. The jury was also told that it should disregard any instructions that were
     inapplicable to the facts (CALJIC No. 17.31), and we presume the jury followed
4    the court's directive. (*Waidla, supra,* 22 Cal.4th at p. 725.) Moreover, as set forth
     in section I, *ante,* the evidence against appellant was so significant that any error
5    in giving CALJIC No. 2.03 was harmless under any standard.

6    (Lodged Doc. No. 1, Opinion, at 19-25.)

7          In this instance, Petitioner made conflicting statement regarding the Williams' check

8    which could be considered as a consciousness of guilt.  In addition, Petitioner told officers that

9    he entered the Hetrick's yard and pounded on the back door with a large rock because he had to

10   urinate, which could also be construed as a consciousness of guilt.  CALJIC No. 2.03 was

11   nothing more than the standard consciousness-of-guilt instruction, and it was properly phrased in

12   permissive, not mandatory terms, as the jury was instructed that it may, but was not required to

13   infer consciousness of guilt from false and/or conflicting.  In addition, the jury was instructed

14   that consciousness-of-guilt evidence was not sufficient in itself to support a finding of guilt, and

15   any weight to give to such evidence was the exclusive province of the jury.  Moreover, the trial

16   court did not single out any particular testimony by defendant, and the determination of whether

17   the jury found such conscious-of-guilt evidence was left open for the jury to determine.  Further,

18   the jury was instructed with CALJIC Nos. 2.20 ["[i]n determining the believability of a witness

19   you may consider anything that has a tendency reasonably to prove or disprove the truthfulness of

20   the testimony of the witness . . ." ], 2.21.2 ["[a] witness, who is willfully false in one material

21   part of his or her testimony, is to be distrusted in others.  You may reject the whole testimony of

22   a witness who willfully has testified falsely as to a material point . . ."], and 2.90 ["a] defendant

23   in a criminal action is presumed to be innocent until the contrary is proved, and in case of a

24   reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.

25   This presumption places upon the People the burden of proving him guilty beyond a reasonable

26   doubt."].  (CT 95, 97, 100.)

27         In any event, even if it was error for the trial court to give the consciousness-of-guilt

28   instruction, Petitioner has failed to establish that the challenged instructions had a "substantial

and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507

U.S. at 637.  As explained in the statement of facts above, the evidence against Petitioner was

strong and generally uncontroverted. Without the benefit of the consciousness-of-guilt

instruction, it is very likely that the jury would have applied its common sense to draw a negative

inference against Petitioner based on the fact that he made false and conflicting statements.  The

challenged instruction arguably benefitted Petitioner by instructing the jury that the

consciousness of guilt evidence was not, in itself, sufficient to warrant a finding of guilt.  Under

these circumstances, the trial court did not err in advising the jury with CALJIC No. 2.03, and

Petitioner's claim should be denied.

E.     <u>Instructional Error-CALJIC Nos. 2.80 and 15.05</u>

        Petitioner contends the trial court erred by giving CALJIC No. 2.80 (evaluation of expert

testimony) and CALJIC No. 15.05 (forgery of an endorsement) because they were not supported

by the evidence.  Petitioner argues these instructions may have confused the jury based on the

language and nature of the evidence.

        In the last reasoned decision, the Court of Appeal denied the claim stating:

A.     **CALJIC No. 2.80**

        The jury herein received CALJIC No. 2.80, expert testimony, which stated:

> "[A witness] who [has] special knowledge, skill, experience,
> training or education in a particular subject [has] ... testified to
> certain opinions. This type of witness is referred to as an expert
> witness. In determining what weight to give any opinion expressed
> by an expert witness you should consider the qualifications and
> believability of the witness, the facts or material upon which each
> opinion is based, and the reasons for each opinion.
>
> "An opinion is only as good as the facts and reasons on which it is
> based. If you find that any fact has not been proved, or has been
> disproved, you must consider that in determining the value of the
> opinion. Likewise, you must consider the strengths and weaknesses
> of the reasons on which it is based.
>
> "You are not bound by an opinion. Give each opinion the weight
> you find it deserves. You may disregard any opinion if you find it
> to be unreasonable."
> The court is required to instruct on expert testimony when the
> testimony expressed is an opinion on "a subject that is sufficiently
> beyond common experience that the opinion of an expert would
> assist the trier of fact." (Evid.Code, § 801, subd. (a).)

Appellant correctly notes that neither the prosecution nor the defense called an expert witness in this case. Respondent quizzically asserts that CALJIC No. 2.80 was properly given based upon the testimony of Doug Lovell, an identification technician for the Modesto Police Department. Respondent fails to realize that Mr. Lovell testified at the bifurcated bench trial on the special allegations, as to whether appellant's fingerprints were on the identification cards attached to various court and prison records, and did not testify in front of the jury.

As explained *ante,* it is error for the court to instruct the jury on abstract principles not pertinent to the issues in the case. (*Guiton, supra,* 4 Cal.4th at pp. 1129-1130; *Robinson, supra,* 72 Cal.App.4th at pp. 428-429.) Where the court gives a legally correct but inapplicable instruction, the error " 'is usually harmless, having little or no effect "other than to add to the bulk of the charge." ' [Citation.]" (*People v. Lee* (1990) 219 Cal.App.3d 829, 841 (*Lee*).)

Appellant asserts the court's erroneous decision to give CALJIC No. 2.80 was prejudicial because the jury might have mistakenly believed certain witnesses were experts, and assigned more weight and value to their testimony. Appellant points to the testimony of Ms. Hernandez, the clerk at the Money Mart, and her testimony that the check did not look right to her because the handwriting on the check seemed similar to appellant's signature on the photo ID. But Ms. Hernandez also testified she did not have any formal handwriting expertise, she did not have any training in handwriting analysis as part of her job, and she was not familiar with appellant's handwriting.

The jury herein received CALJIC No. 17.31, to disregard any instructions that were inapplicable to the facts, and we presume the jury followed the court's directive. (*Waidla, supra,* 22 Cal.4th at p. 725.) CALJIC No. 2.80 did not instruct the jury that it actually heard any expert testimony, but only on how to evaluate the opinion of an expert. The jury did not hear any expert testimony, and it heard Ms. Hernandez's admission that she was not a handwriting expert and did not have any specialized handwriting training for her job. We must therefore presume the jury followed CALJIC No. 17.31 and disregarded the instruction on expert testimony.

It could be argued, however, that the court should have instructed the jury as to lay opinion testimony, based on Ms. Hernandez's testimony that the writing on the check looked like appellant's signature on his identification card. Evidence Code section 800 states that lay opinion testimony is admissible if it is based on the perceptions of the witness and is helpful to a clear understanding of his or her testimony. CALJIC No. 2.81 states:

"In determining the weight to be given to an opinion expressed by any witness [who did not testify as an expert witness], you should consider [his] [her] believability, the extent of [his][her] opportunity to perceive the matters upon which [his][her] opinion is based and the reasons, if any, given for it. You are not required to accept an opinion but should give it the weight, if any, to which you find it entitled."

Ms. Hernandez testified she did not have any specialized expertise or training in handwriting analysis, but she offered her opinion that the check seemed to be written in the same handwriting as appellant's signature on the photo ID. CALJIC No. 2.81 would have helped the jury evaluate Ms. Hernandez's lay opinion testimony.

While the jury did not receive CALJIC No. 2.81, it was instructed on CALJIC No. 2.20, which instructs the jury that it is the sole judge of the believability of the witness and the weight to be given the testimony. The instruction also gives the jury various items it may consider in determining the believability of a witness, including the ability of the witness to observe the facts about which he or she testified, the ability of the witness to recall the events, the quality of the witness's testimony, the demeanor of the witness, any possible bias the witness may have, the existence or nonexistence of a fact testified to by the witness, and the attitude of the witness.

CALJIC No. 2.81 informs the jury that in deciding the weight to be given to a witness's opinion testimony, the jury should consider the believability of the witness, the ability to observe the facts on which the opinion is based, and the reasons for the opinion. The instruction concludes "[y]ou are not required to accept an opinion but should give it the weight, if any, to which you find it entitled." The quoted portion of CALJIC No. 2.81 reiterates the jury's obligation to determine the weight to be given a witness's testimony using language slightly different than CALJIC No. 2.20. The remaining portions of CALJIC No. 2.81 are repetitive of CALJIC No. 2 .20. The believability of the witness, the extent of the witnesses opportunity to perceive the matter on which the opinion is based, and the reasons given for the opinion are all referred to in CALJIC No. 2.20. It could thus be argued that CALJIC No. 2.20 provided the jury with ample guidance to disregard Ms. Hernandez's testimony or give it little weight. CALJIC No 2.81 would have added little to the deliberations in this case.

Even if the court should have given CALJIC No. 2.81, appellant was not prejudiced by the absence of the instruction. Ms. Hernandez's opinion was based on her examination of the stolen and forged check, and appellant's signature on his photo ID. She copied both items, the Williams' obtained that copy and gave it to the police, and the document was introduced into evidence. The jury thus had the same opportunity to examine the same items to evaluate Ms. Hernandez's testimony pursuant to CALJIC No. 2.20. Moreover, as set forth in section I, *ante,* the evidence against appellant is overwhelming such that Ms. Hernandez's opinion was not crucial to the case.

B.   **CALJIC No. 15.05**

Appellant was charged in count IV with a violation of section 470, subdivision (d), that he "willfully, unlawfully, fraudulently and feloniously make, alter, forge, counterfeit, utter, publish, pass, or attempt or offer to pass, a check, bill, money order, or other order in writing for the payment of money." The jury was instructed with CALJIC No. 15.01, as to the elements of a violation of section 470, subdivision (d), as follows:

"1. A person uttered and passed a forged check.

"2. That person knew that the check was false, altered, forged or counterfeited;

"3. That person uttered and passed the check with the specific intent to defraud another person; and

"4. That person uttered and passed the check with the specific intent that it be accepted as true and genuine."

CALJIC No. 15.01 further explained the words " 'utter' and 'publish' " mean the same thing, to use or attempt to use "an instrument, document or writing to either (1) assert that the instrument, document or writing is genuine, or (2) represent to someone else that it is genuine. The assertion or representation may be direct or indirect...."

The jury also received CALJIC No. 15.02, that appellant was accused of forging and uttering the check, and he may be convicted of forgery "by proof of either the forging, or the uttering, of the forged instrument or document, or of both forging and uttering." CALJIC No. 15.03 stated the existence of the specific intent to defraud was an essential element of forgery, but it was not necessary for a person to be actually defrauded to complete the crime.

Appellant's assignment of error is based on the jury's additional receipt of CALJIC No. 15.05, which stated:

> "Forgery is committed if a person, with the specific intent to defraud, falsely writes or signs as an endorsement on the back of a check, bill of exchange, or other negotiable instrument, the name of the payee of the instrument or the name of any other person whose signature is necessary in order that the instrument may be cashed or otherwise negotiated."

Appellant correctly notes that there was no evidence that he endorsed the check he presented at Money Mart. Indeed, Ms. Hernandez testified that when appellant presented the check to her, it was already filled out and he did not write anything on the check in her presence. She did not know if he had signed the back of it. Appellant asserts the instructional error is prejudicial because CALJIC No. 15.05 "suggested to the jury that appellant had forged check no.2056 based on a record devoid of proof appellant ever wrote one word on that check. Suggesting to the jury that appellant had written the check through erroneous jury instructions influenced their consideration, not just of the forgery, count, but of all the counts in this case."

This argument is patently absurd. As explained *ante,* where the court gives a legally correct but inapplicable instruction, the error " 'is usually harmless, having little or no effect "other than to add to the bulk of the charge." ' [Citation.]" (*Lee, supra,* 219 Cal.App.3d at p. 841.) The jury was correctly instructed on the elements of forgery, and it heard evidence that appellant walked out of the burglarized house of Mr. and Mrs. Williams, their checkbook had been stolen, appellant tried to cash a check from their bank account a few hours after he was seen at their burglarized house, he told Ms. Hernandez that he did a side job for the maker, and Mr. Williams testified he did not write the check. While appellant later told the police that a friend gave him the check, that statement raised a credibility question for the jury to resolve, completely apart from any issue raised by CALJIC No. 15.05. Any error in giving the instruction is necessarily harmless.[FN7]

FN7. Having rejected appellant's instructional issues, we similarly reject his assertion of cumulative instructional error. (See, e.g., *People v. Cash* (2002) 28 Cal.4th 703, 741.)

(Lodged Doc. No. 1, at Opinion, at 25-30.)

With regard to CALJIC No. 2.80, the Court does not find it "so infected the entire trial

that the resulting conviction violates due process.  Estelle v. McGuire, 502 U.S. at 72.  In this

instance, the appellate court correctly recognized that there was no expert testimony presented to

the jury in this case.  Store clerk, Mri Carmen Hernandez testified that on July 10, 2004,

Petitioner went to the Money Mart and attempted to cash a check allegedly signed by Mr.

Williams.  Because Ms. Hernandez was unable to make contact with Mr. Williams to confirm

that the check was given to Petitioner, she could not cash the check.  Ms. Hernandez stated that

something did not "look right" about the check, as most checks do not contain information in the

memo section, especially for "side jobs."  (RT 78.)  Ms. Hernandez indicated that the writing on

the check looked similar to the signature on Petitioner's Identification Card.  (RT 82.)  However,

Ms. Hernandez acknowledged that she was not familiar with Petitioner's handwriting and that

she did not have any formal handwriting expertise.  (RT 82-83.)  Nor did Ms. Hernandez

consider herself an expert in handwriting.  (RT 83.)  The instruction only specified the weight to

be given to any expert testimony, and because there was no expert testimony it is reasonable to

infer the jury did not give more weight to Ms. Hernandez's testimony.  In addition, the jury was

instructed with CALJIC No. 2.20 that they were the sole judges of the witness's believability and

any weight to be given to each witness's testimony.  The jury was also instructed with CALJIC

No. 17.31 to disregard any instructions that were not applicable to the facts of the present case.

In sum, there is not a reasonable probability that a different verdict would have been rendered

had the jury not been instructed with CALJIC No. 2.80.

With regard to CALJIC No. 15.05, Petitioner contends that there was no evidence that he

forged the endorsement on the check presented to the Money Mart, and the trial court erred by

giving this instruction.  Petitioner argues that it was undisputed that he did not write on the check

at the store, and Ms. Hernandez could not remember if he signed the back of the check.  The

Court does not find Petitioner's argument persuasive.

The determination of whether Petitioner actually forged the writing on the check was a

factual determination properly presented to the jury.  The evidence presented at trial supported

the trial court's decision to advise the jury with CALJIC No. 15.05.  Although Petitioner claims

that he received the check from a friend and Ms. Hernandez did not observe him write on the

check, the evidence reasonably established that Petitioner was the only individual who falsely wrote out the check.  Petitioner overlooks the facts before the jury that on July 10, 2004, at approximately 9:00 a.m., he was observed leaving the Williams' backyard through a gate carrying a black garage back that was partially filled.  (RT 26-27.)  Later, between 1:30 p.m. and 2:00 p.m., Petitioner went to the Money Mart store and attempted to cash a check from the Williams' account claiming he had done a "side job" for them.  (RT 74-79.)  Mr. and Mrs. Williams both testified that their checkbook was stolen from their home and they did not write a check to Petitioner.  (RT 47-48, 5-51, 58-60.)  Contrary to Petitioner's claim, the clear and reasonable inference is that Petitioner burglarized the Williams' home, stole their checkbook, forged the check, and then attempted to cash it at the Money Mart store, and the trial court properly instructed the jury pursuant to CALJIC No. 15.05.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    May 17, 2010**          _____/s/ Sandra M. Snyder_____
                              UNITED STATES MAGISTRATE JUDGE